May it please the court, my name is Sean Malone, counsel for the Center for Environmental Law and Policy in Columbia Riverkeeper. At counsel's table with me today is Lauren Goldberg, co-counsel. I'd like to reserve five minutes for rebuttal and I'll keep watch of that. Today before the court I'd like to address two issues, cumulative effects and indirect effects, as well as answer any questions the court may have. But first a little background if I may. This case entails the first time water rights have been issued in the Columbia River roughly 15 years. Annually 2.65 million acre-feet of water is diverted from the Columbia River as part of the Columbia Basin Project alone. In addition to that there's agricultural diversions, there's agricultural pollution from pesticides and fertilizer runoff, there's municipal industrial pollution, there's also toxic pollution from the Hanford nuclear reservation site, as well as the Tech Cominco facility, there's extensive commercial fishing, sedimentation from logging, 11 main stem dams on the Columbia River which has altered the flow and fish migration on the river. This debate's been going on a long time. It has been. There's a lot of controversy over the Columbia River. Well you're telling us. Some form of it's been in the news. Just so that what you're saying, this is the first time. Now the drawdown project, why is it, if I look at just the numbers, it seems to be relatively minor relative to what we're talking about on the whole project. Am I wrong? Are you saying relative to the entire Columbia River? Yes. And when I'm looking at, because it's the 22,500 acre feet to 132,500 acre feet in drought years, right? Correct. So but is this, if you know, if you're doing the math, and I might not be doing the math correctly, it seems like it's not more than 5% of the annual diversion of water which is like 2.65 million acre feet. Am I right or wrong on that? If, doing that math in my head real quick, you're probably right. According to 2.65 million from this Columbia Basin project. But I think what that really gets to, your honor, it's one of the issues I really wanted to address, was cumulative effects. And cumulative effects, as you're likely aware, are adding those incremental impacts from past, present, reasonably foreseeable projects. And the entire notion of cumulative effects, I think, was really promulgated here in order to look at these potentially smaller impacts. The straw that breaks the camel's back. Exactly, your honor. Or else, if it goes too far, then you're concerned that there'll be no turning back if information comes out that should turn them back. Yes, I think I follow you. I mean, it seems, this seems like apparent in the sense, if you let them have an inch, then they're gonna take, you know, a foot. And then, so every inch, everyone fights over. And if we keep taking inches every year and so forth throughout the past. So, but, but I guess we would concede that at some point they probably could take an inch and not be in some of the violations. But everyone's concerned about every inch that happens here. So everyone's back every inch. So to move on, and you've addressed the 82,000 acre feet in non-drought years and the 132,000 in drought years. I think one of the more important issues here is the significant expansion of the Weber-Siphon complex, which was addressed in the briefing. And what it, it's a significant infrastructural expansion as part of the Lake Roosevelt project, which was actually not intended to be part of the Lake Roosevelt project at first. You know, that's an excerpts of record 508, an internal memo from the Bureau of Reclamation, states that they realized that in order to carry some of the, a fraction of the 30,000 acre feet of water to the Odessa sub area, we're gonna have to build this massive, or complete this massive pipe, which actually has the ability to convey 1,950 cubic feet per second. But the Lake Roosevelt project itself will only use 181 cubic feet per second. On this argument, just so I understand, make sure I understand it correctly, obviously this project is not going to use the full capacity of those being an enabler, because by having this huge capacity, you sort of get into the a-for-tuary, why not just fill it up? Is that basically the argument? The argument is one of, I was addressing cumulative effects in this... But then you shifted to... I was trying to, yes, so I was just trying to explain the Lake Roosevelt project as it was, what it entails, and this significant expansion of it entails reasonably foreseeable projects, such as the Odessa sub area EIS, and it also implicates indirect effects, that is, effects that are going to occur later in time. And just jumping to indirect effects real quick, I can cover it. The Ocean Advocates case cited in our briefing essentially stands for the proposition that when you expand infrastructure, when you increase the capacity of some facility or some infrastructure, in this case a massive subterranean pipe, that the NEPA requires that you consider those indirect effects that will happen later in time, if they're reasonably foreseeable. And here we have all these reasons as to why the Odessa sub area EIS, which is currently contemplating 170,000 to 370,000 acre-feet diversions for the Odessa sub area, that that will utilize this increased infrastructure, this increased capacity. But they aren't the cause. I mean, you still have to have the whole permitting and EIS, etc., for those. So that's why I'm having some trouble as to why that's an indirect effect. And you mentioned the Oceans case. Ocean, yeah. And could you link that up, please, as to why you think that case supports this as being an identifiable indirect effect? Sure. Essentially, in the Ocean Advocates, BP increased the size of their pier for a refinery. And in doing so, the plaintiffs in that case said, well, there's reasonably foreseeable indirect effects, such as oil spills or an accident with the tankers, because you're getting more and more tankers involved there. And how do we distinguish between borrowing worry and foreseeable? What was the middle? Borrowing worry. You're worried about certain things that are going to happen in the future, but what's foreseeable? Exactly. What is foreseeable? Because borrowing worry would not qualify here, you know, but foreseeable may. Sure. And I'll jump to the issue of reasonably foreseeable. This court has held that a notice of intent makes a project reasonably foreseeable. That's in Timok Tribe, which is a recent case from 2010, and then Tanaki Springs v. Clough, which is also another case that recognized that if there's a notice of intent out there, then that makes a project reasonably foreseeable. In addition, if an agency releases a press release, that has also been identified as making something reasonably foreseeable. In this case, we have both of those. We have a notice of intent issued in August of 2008. That's 10 months before the final EA and FONSI for this case. And what is the notice of intent for? It was the notice of intent to prepare the Odessa sub-area EIS, which will... But wasn't it preliminary to that? Wasn't it the notice of intent to take a look at whether there are alternatives, rather than they'd have to go forward then? You're like, you're still one or two steps out, right? I think I understand what you're saying. There was this interesting thing in this case called an appraisal level investigation that occurred 15 months before, and that sort  So there are two distinct things. And what the Odessa sub-area, excuse me, the appraisal level investigation did, was it took four alternatives, and it looked at them, and it expressly determined that all four of those alternatives are feasible. And that is in the briefing. And then they chose alternative B, which they said was feasible, and they turned alternative B into this Odessa sub-area EIS, which has been ongoing. So in terms of chronology, it went the appraisal level investigation was completed in March of 2008. That's 15 months before the final EA and FONSI issued. Then you had the notice of intent for the Odessa sub-area EIS, which took alternative B from the appraisal level investigation and turned that into the Odessa sub-area EIS. It's really interesting. You usually don't have this appraisal level and to an EIS. I have a question, and I'm not sure. I want to sort of focus on what your objection is, because there were EISs prepared by the Washington Department of Ecology. And I'm not, is it your argument that the environmental assessment cannot refer to or rely on EISs prepared by the Washington Department of Ecology? Or is it your argument that it may refer to the EISs, but that the EISs do not adequately analyze the cumulative impact? I think that's a good question, Your Honor. And we've actually argued both of those in the alternative. Yeah, right. So we first took the position that in South Fork Band Council, this court held that a federal agency cannot rely on a non-NEPA document to satisfy its NEPA analysis, especially one prepared by a state agency. And then in addition, there's the CEQ guidance that says... See, I'm kind of thinking that can't be right. Okay, then I'll go to the alternative that we argued. No, but I'm wondering, you know, I'm thinking that you still can attack it, and you can say why it's not sufficient. But it just sort of seems if there's something out there that is relevant and studies things, it's hard for me to believe that before they could even consider it, they would just have to go out and mirror and do the exact same thing and waste a whole lot of time and money. Sure. So addressing the alternative argument, essentially what we have here is this paper trail. We have the Lake Roosevelt EA Fonzie that says...it has a couple paragraphs that say...it generally introduces the idea of cumulative effects, and then it says, we already did all this in the supplemental EIS. So go look at the state of ecology's supplemental EIS. Go to the supplemental EIS, you find that these two cumulative effects analysis actually mirror each other. Three of the paragraphs are exactly the same. The supplemental EIS then says, let's go...it's not here. You gotta go look at the programmatic EIS. You go to the programmatic EIS, it lists some things and tells you to go to various different places, and it has one of the most unworkable statements that I've seen. So your secondary argument would be that you can look at them, but you can't avoid doing your job just because you look at something. I would say that the ecology's cumulative impacts analysis is insufficient under Ninth Circuit precedent. It doesn't add incremental impacts. First of all, there's a programmatic... Let me just go back on that then. Certainly that little heading of cumulative effects where they talk about that, that's almost a throwaway, if you will. But if you read through the whole thing, you're saying that that too is insufficient. You don't have to put it right in the right paragraph if it's in there. Sure. And I understand what you're saying. You're saying it's throughout the document is what you're essentially saying, not... Correct. I mean, it raises the question of whether you have to hunt and peck to find this stuff, and whether that should be their job or our job or your job. Sure. And I think it's... First of all, if we go back to the programmatic EIS, that's a specifically general document that tells us that when the site-specific document comes about, that's when we'll do the analysis. Well, that was a supplemental EIS, right? But the supplemental EIS says, let's look at the cumulative impacts in the programmatic EIS. So we're asking ourselves, where are these, you know, this analysis? And if the analysis is actually just interspersed throughout the entire EIS somewhere, such as it says on page 259 of the programmatic EIS, it says many of the cumulative impacts of the management program components are included in discussions in previous sections. And you just sort of throw up your hands and you're saying, where are these? There's no sites to these earlier areas. And this is why, in our briefing, we followed the paper trail. We very much laid it out. We encouraged the court to follow that and see the circularity in the arguments and find that actually there were no incremental impacts combined with this project. And in that, I'd like to reserve the last two minutes of my time. Okay. May it please the court, I am David Shilton, representing the U.S. Bureau of Reclamation. I'll be sharing five minutes of my time with Mr. Young from the Washington Department of Ecology. The function of an EA, of course, is to determine whether a proposal for federal action will significantly impact the environment. I think it's significant that the plaintiffs have not challenged the analysis of direct environmental effects in this EA, which finds that these will be insignificant. Instead, they focus on cumulative impacts. Here, the EA did consider the possibility of cumulative impacts. This is an excerpt of Record 156. It noted that future development of additional water delivery projects in the area could result in a number of environmental impacts, including impacts to water quality, increased fish migration times, and further reduction in the shrub steppe habitat of if irrigated acreage increases. But then it reasonably concludes that these possible impacts don't amount to the sort of significant impact that would require an EIS at this point. Could you, excuse me for interrupting you, but could you just go back a step for me and explain, describe what the project is that we're talking about? Yes. This federal project, called the Incremental Storage Releases Project, is basically a way for the Bureau to carry out its part of a determination that was made, really, by the state in a consensual process. The state is the one who determines, you know, is it in the public interest to divert certain amounts of water for irrigation, municipal and industrial, et cetera. It made that, the state made that determination. That's under what authority? Well, the states basically control water. They oversee the appropriation of water within their state. Yeah, but this, the water that they're appropriating is from? It's stored by the Bureau, and the Bureau also conveys it as part of the Columbia Basin Project, at least that part of it, the 30,000 acre feet that's for irrigation. So in order to draw down the water, the project that we're talking about, there has to be joint work between the state and the federal government to decide how much is needed and how much should be drawn down from the federal storage? Is that essential? That's right, and the Bureau has to determine whether actually drawing it down and releasing it will not have a significant impact on the environment. So its focus is somewhat narrower than the state. It looked at that, and it did look at, you know, the possibility of future projects. It found that that's very speculative at this point, and it is. Well, does that mean that there isn't going to be any more water? What does that mean, that future projects are speculative? Well, it's for there to be a future expansion, say, of the Columbia Basin Irrigation Project. Is that what we're talking about? That's basically the concern, right. That would require expansion of the canals, and it would be very expensive. The record shows probably at least a billion dollars. Who would do that? The Bureau would do the expansion of the canals. Congress would have to appropriate the money for it. But they're concerned the horses, you're letting the horse out of the barn, or the train out of the station, and once it goes, that it doesn't matter what you look at, you know, that we all know where it's going. And they mention, you know, the Odessa, the Odessa sub area, and the, what's the Weber siphon? You know, those are all concerns. Yeah, and the test that the court has looked to is whether the agency has made some sort of irrevocable commitment that ties its hands so that it can't, down the line, decide that, gee, this is not a good idea, this may harm the environment. And here, the agency has not made any kind of commitment to future actions. The Odessa sub area special study, EIS, is just that. It's a study. Okay, the Bureau announced its intent to prepare an EIS for the Odessa sub area specially in 2008, right? Right. And before it completed its EA for the drawdown project. Why should we not require the EA to consider the alternatives being considered for the Odessa sub area? Because the notice of intent, all that it was announcing was that there would be this study. It was not a determination to actually carry out any particular alternative. They're simply looking at the feasibility of various alternatives. So it's all, it's still all very speculative. The Bureau is just, you know, taking a look. Let me, could you just clarify, is the EIS that was referenced, is that, did that come after these administrative proceedings with respect to the study? I mean, time-wise? Well, it's sort of both before and after. It was the notice of intent came before, but the, they're in the middle of the EIS process now. The draft came out in the fall. What about picking the alternative? There's been no alternative chosen. Okay, that was my question, because I thought there was just a study of alternatives that was listed, that was at the notice of intent stage. The appraisal, the appraisal level study, and the Bureau does have this kind of unique procedure. The appraisal level study is a very sort of basic look, just based on existing information, and a look at alternatives to see if it's worthwhile even going forward with a full feasibility study that would look at design, so forth, determine costs. So has it gone past that point? So the appraisal level has been done. And now we're into the stage of looking at the actual feasibility. But again, no determinations have been made about a particular way to go forward. Everything's open. Everything's on the table. The Bureau can decide not to go ahead with it. So the appraisal's done. It says all of the options are feasible, correct? Well, yeah, it basically, it allowed the options to go into the feasibility stage. It may have cut out some as being, you know, completely off the table. But basically, if you look at the draft EIS that the plaintiffs have referred to in their reply brief, I think you'll see that it has a wide array of alternatives that are being looked at, and no action. Would you explain to me, I'm trying to understand on the ground what this means. I come from the desert, so. But we, when you say options and alternatives, what in general are you talking about? For the Odessa subarea study, it would basically be options for replacing groundwater pumping with irrigation surface water. So it would be different ways to do that, and a no action alternative, not replacing any more groundwater at all. I think those are the options there. The broader questions, options about, you know, should there be irrigation in this area in the first place, that's something that the state looked at in its EIS process, in the programmatic EIS and the supplemental EIS, and the programmatic EIS in particular, looked at alternatives like, you know, going back to dry land farming instead of growing potatoes. So the state decides what it wants, and then you do the, then the federal government does the EA to see what environmental consequences that, what the state wants will have? Well, the state decides, I think, the basic allocation, you know, we want this much water for agriculture, this much for fish, this much for, and the bureau is really figuring out how to do that, how it can, you know, work with that with its storage in Lake Roosevelt. So it's. So the basic options are to give more water, or to not give more water, and have the state to mine it out of the ground? Yeah, and this project is really kind of a small piece of that larger question. The state, through this consensual process, determined that at the present time they got consensus on going forward with 30,000 acre feet per year additional water for irrigation to replace groundwater, about that much for municipal industrial, and about that much for additional water in the stream for fish. So. Let me ask you more specifically on the challenges they've made, the cumulative effects, which seems like a very cursory statement by the U.S. about, well, there'll be some, but they're minimal, see the state reports, basically. And I really wonder, two things, maybe you can help me out. Under Kern and other cases, they talk about detailed and quantifiable analysis. And I don't see it there. So then it brings back to that mind of, you know, from the old case that talks about whether we're pigs hunting truffles. Do we, is it our obligation then to say, okay, well, it's certainly not there. Therefore, we got to look through every one of these documents to figure out where do we find cumulative effects? Where does the burden fall on documenting the cumulative effects and doing it in your documents on behalf of the government? I think with regard to the cumulative effects of possible future projects, which is the concern. Right. The Bureau did all it could at the time, given that the future projects are so speculative that it could not have included more detailed or quantitative analysis of what could happen in the future when it's so completely open. It has detailed and quantitative information about, you know, the level of the river and the lake and that. But I just don't think it was possible to do it in the future. But this goes to my concern. Thank you. This goes to my concern, because who decides what those levels will be in the future? Is, in terms of the amount of water, is it going to be the state? It'll be the state, right, those quantity decisions. Over my time, I don't want to take the state's time unless there are questions. Right, not yet. So just going back to the past cumulative, for example, I think you referenced that one in the earlier part of your argument. That also is very conclusory. So, I mean, we're kind of left to say, well, it's almost a trust me, the way it's written up. Like, well, yeah, we looked at this stuff, and we just don't see anything there. Yeah, there is this past, and here's how the lake, you know, evolved over time, et cetera. Here's an example. But we really don't have any detail on these cumulative effects. And I don't think it's enough to say, even on the future ones, well, it's just too speculative. Therefore, we can't give anything. I don't think it is too speculative. So I'm just discomfited by that. Maybe you can tell me that there's some case I ought to be looking at, or somewhere in your documents I ought to reread to satisfy that inquiry. I think the question is, is there enough detail for the agency to make the decision that's before? The decisions on this limited project with small amounts of water. I think there's enough in there to take the hard look at the decision that was in front of the Bureau. The bigger questions, you know, those are being considered in the ongoing EIS project process, and plaintiffs can participate in that. If you are expanding the capacity up to a large level, and the state determines how much water is going to be used in the future, don't you really have to take a hard look at all of that? Well, the Weber siphon that's been raised, it's such a small part of what would have to occur if they were to expand the canals, that it doesn't drive that decision. The Columbia Basin project has always been constructed in a way that allows capacity to be added. You may have seen references to I-90, and the fact that when that was built in the 60s, they put two pipes under it, even though they only needed, you know, the one for that present need. Well, this is somewhat. That may not have been such a good idea either, some of those decisions. Well, on the Weber siphon, he was, I believe that the appellant was talking about that the indirect consequences of the expansion of the Weber siphon. Is that, was that, and so that the expansion of the Weber siphon does exceed the need for the drawdown project, right? That's correct. So why should the EA not be required to consider the likely indirect consequences of that expansion? Because the Weber siphon addition doesn't drive any decision to expand irrigation. In order to expand irrigation beyond what's in this project, you would have to expand the east low canal. That's about an 80 plus mile canal of which these siphons are very small parts. And so the expenditures for the expansion of the canal would dwarf what's being done now. Is the canal a federal project? Yes, it's a, you're right. Are you saying that we'll have an EA if they want to expand the canal? Well, an EIS is what's going on now with the, that's something that's being looked at in the Odessa Sub-Area Study EIS is expansion of the canals and what that entails. So that's, it's really not really. And you say you don't, you shouldn't look at that now? Well, this small decision didn't, doesn't drive anything in that process. It didn't commit the agency to any particular option. Thank you. We'll give you a co-counsel a few minutes. Good morning. It looks like I've got about 31 seconds. No, we'll give you, we'll give you, we'll give you the five minutes. I'll take just a couple minutes then. You said you'd get five. Listen. You don't have to use it.       And I'm the co-counsel. And I'm the co-counsel. And I'm the co-counsel. And I am the co-counsel of the State Department of Ecology in this matter. The state intervened here because of course the Bureau relied on the state's environmental work and the state believes that the EISs that are prepared were thorough and complete. In addition the legislature has declared in RCW 90.90 that this project is in the public interest and the Department of Ecology also reached that conclusion in issuing the water rights to the Bureau for the project. The state did look at the direct, indirect, and cumulative effects of this project in those two EISs. The state looked at the effects in Lake Roosevelt, downstream, and in the Odessa sub-area. It's important to understand that the project does... What's your view about the question that I asked Appellant's counsel about the reference to the state's work? You know, how does that figure? I mean, it doesn't... It obviously doesn't eliminate the feds from having to do certain things, but that was sort of his first argument. You can't rely on them at all. What's your take on reliance on state reports? There's a number of cases from this court and the CEQ regulations that encourage cooperation between the agencies and that do allow for incorporation by reference, at least in regard to an EIS. And the district court concluded that that same analysis ought to apply to an environmental assessment as well. It simply wouldn't make sense for the Bureau to duplicate a bunch of work that the state had already done. This is... What is at issue here is an environmental evaluation by the state. Is that what you're saying? Yeah. The challenge is just to the Bureau's work, but the Bureau did rely and incorporate much of the state's work. The state's work was environmental in nature, or was it economic? Analysis of environmental impacts. There was a complete analysis with respect to cumulative impacts in particular, which has been the focus of the argument here. The state concluded that the project's direct impacts were insignificant, and therefore the cumulative impacts were insignificant. The state did acknowledge that development of future projects in the basin could lead to cumulative impacts, but the conclusion was that there was no specific project to analyze at this time. Therefore there was not practical to analyze any of those future proposals, which vary widely in scope and amount of infrastructure that's required and so forth. The plaintiffs rely heavily on the installation of the Weber siphon, which is a pipe that's used to pump the water here to the Odessa sub-area, but it's important to understand that the project has three distinct components. Basically the Bureau adjusts the release schedule of the lake to release the water earlier in the year. Approximately a third of that water stays in the river for in-stream flow. Another third of it goes for municipal and industrial use for some of the communities downstream, and about a third of it goes to the Odessa sub-area to get some of the irrigators there off groundwater. The two-thirds that relate to in-stream flow and municipal and industrial use have absolutely no connection at all, nothing to do with the Odessa sub-area, and the release of that water for those purposes doesn't make any expansion of the Odessa project or the Columbia Basin project more likely or have anything to do with it. Those aspects of the project have independent utility, and I cite to you your case in Wetlands Action Network, which is cited in our briefing, which says that if the project has independent utility, then you don't need to analyze possible future projects in a current EIS. Even with respect to the small amount of water that goes to the Odessa sub-area, that too has independent utility because it gets some of the irrigators there off of the groundwater use where the groundwater is declining. Now, the plaintiffs argue that this is going to lead to a large expansion of the Columbia Basin project and a large expansion of irrigated agriculture. That is just absolutely not the case at all. The pipe that's being installed there is a large pipe. It's sized that way to match the pipes that are already there, and it's simply a matter of making sense to connect the pipes together with the same size. That doesn't allow for the future expansion of the Columbia Basin project because there's a whole host of other infrastructure that's needed to expand the Columbia Basin project, including I think seven other siphons, as well as an expansion of the East Low Canal south of I-90, not to mention a whole new source of water. The amounts of water that we're talking about in that Odessa sub-area study are enormous. In the hundreds of thousands of acre-feet, there's no, at this point, no determination as to where that water is going to come from, if it could come from anywhere. The dollars that are involved in that proposal are also enormous in the range of half a billion dollars for the smallest of the alternatives, and it's simply not reasonably foreseeable that those projects are going to go forward. You've had your time. Thank you very much. Just to address a couple things. We'll give you a little time if you want. Okay. Thank you. Just to address a couple things that were raised. First of all, cumulative impacts are immensely important in this case, and that's not even coming from plaintiffs, appellants here. This is coming from Washington Department of Fish and Wildlife, and they stated, cumulative impacts will likely be the most significant environmental concern associated with this program, and that's why we have focused so much on cumulative impacts. Now if we look at reasonably foreseeability, the test is not whether it's irrevocable. It's whether it's reasonably foreseeable. That is indicated by notices of intent, not to prepare environmental documents. It's indicated by press releases. In this case, we have even more. We have the appraisal level investigation. Well, is anything reasonably foreseeable now since all the federal and state governments are bankrupt? I guess that's an interesting question that I hadn't taken into account, and the bankruptcy of the federal government is, I guess, a possibility. But on the appraisal study, would it be your view that simply undertaking that appraisal study is sufficient to show a foreseeable impact? No, it's the combination of the appraisal level investigation, the notice of intent, the press release, hiring a private firm to make that EIS, and just to clarify some things here, so the appraisal level investigation was this very preliminary document, and it analyzed four alternatives, and it chose the alternative B, which became the Odessa sub area EIS. When that Odessa sub area EIS is completed, there will be a record of decision, and either 170,000 acre feet or 370,000 acre feet will now run through those pipes that are being constructed now, and as part of that, they will also create that other part of the infrastructure and go to the Odessa sub area. I don't know if I had more time. Are there any further questions? Thank you. The case just argued is submitted for decision. The court appreciates the arguments presented, and that concludes the court session for this morning. The court stands adjourned. All rise.
judges: Schroeder, McKeown, Callahan